# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SHEILA E. MCMILLAN,

      Plaintiff,

vs.                        No. CIV 01-0273 BB/LCS

LARRY G. MASSANARI,
ACTING COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

**THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand (Doc. 10), filed August 17, 2001. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits and social security income. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is not well-taken and recommends that it be **DENIED**.

## PROPOSED FINDINGS

1.      Plaintiff, now forty-one years old, filed her applications for disability insurance benefits and supplemental security income on October 21, 1997, alleging disability commencing January 1, 1997, due to myocardial infarction, diabetes, diabetic retinopathy, and depression. (R. at 14; 42-44.) She has a high school education and an associate's degree in child psychology. (R. at 420.) Her past relevant work was as an instructional aide at an alternative high school and as a bookkeeper. (R. at

422.)

2.      Plaintiff's applications for disability insurance benefits and supplemental security income were denied at the initial level on March 12, 1998, (R. at 26; 368-369), and at the reconsideration level on October 13,1998.  (R. at 27; 370.) Plaintiff appealed the denial of her applications by filing a Request for Hearing by Administrative Law Judge (ALJ) on November 17, 1998. (R. at 38.)  The ALJ held a hearing on October 6, 1999, at which Plaintiff appeared and was represented by a non-attorney.  (R. at 410.)

3.      The ALJ issued his decision on November 19, 1999, analyzing Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F. 2d 1482, 1487 (10th Cir. 1993). (R. at 14-20.)  The ALJ determined that Plaintiff met the disability insured status requirements through December 31, 1998.  (R. at 14.)  At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date.  (*Id*.)  At step two, the ALJ determined that Plaintiff had severe impairments consisting of a history of acute myocardial infarction in July 1996 followed by insertion of a pacemaker, two angioplasties and stent placement, diabetes, diabetic retinopathy and peripapillary atrophy of both eyes with vision of 20/20 on the right and 20/80 on the left, and depression in full remission.  (*Id*.)  At step three, the ALJ found that the severity of Plaintiff's impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599.  (R. at 15.)

4.      The ALJ determined that Plaintiff had symptom producing medical problems, but exaggerated her symptoms and functional limitations.  (*Id*.)  The ALJ further found that Plaintiff had the residual functional capacity (RFC) for at least light work.  (R. at 16.)  At step four, the ALJ

determined that Plaintiff's RFC was sufficient to perform her past relevant work as an instructional aide. (*Id.*) Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.*)

5.      Plaintiff filed a request for review of the ALJ's decision, (R. at 9-10), and submitted additional evidence to the Appeals Council. (R. at 373-409.) On January 19, 2001, the Appeals Council denied the request for review. (R. at 6-7.) Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. On March 9, 2001, Plaintiff filed this action, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

6.      The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F. 2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F. 2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F. 2d 407, 414 (10th Cir. 1983) (citation omitted)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F. 2d 802, 805 (10th Cir. 1988).

7.      In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See Thompson v. Sullivan*, 987 F. 2d 1482, 1486 (10th Cir. 1993) (*citing* 42 U.S.C. § 423(d)(1)(A)).

8.      At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience.  *See id.*

**Administrative Record**

9.      On July 23, 1996, Plaintiff arrived by ambulance at the emergency room of Columbia Lea Regional Medical Center.  (R. at 108; 125.)  At about 1:00 a.m., Plaintiff had become nauseous, vomited, and collapsed in the bathroom. (R. at 125.)  Plaintiff had no pulse or blood pressure upon arrival. (*Id.*)  An EKG showed a third degree AV block with ST elevation in the interior and anterior leads. (*Id.*)  Dopamine, atropine and insulin were administered. (*Id.*)  Plaintiff was intubated and an external pacemaker was placed. (*Id.*)  Maria Cuadros, M.D. diagnosed diabetic ketoacidosis, acute myocardial infarction, dehydration, hypokalemia and diabetes mellitus, and planned to consult with Dr. Botts. (R. at 126.)

10.      James Botts, M.D. stated that, according to her family members, Plaintiff had been fine the night before, until she started vomiting at 1:00 a.m., fell in the bathroom around 4:00 a.m., and was found semi-conscious by her daughter and her mother.  (R. at 127.)  At the hospital, Plaintiff was found to have a complete heart block, diabetic ketoacidosis and fractured ribs from the bathroom collapse.  (*Id.*)  Plaintiff had been weak, tired and dizzy due to vaginal bleeding, but had gained fifteen

pounds during her summer vacation. (*Id.*) Plaintiff was a heavy smoker and had long term problems with indigestion. (*Id.*) She also had a history of migraine headaches, seven eye surgeries for bilateral cataracts, recurrent ear infections, pneumonia in 1993, possible peptic ulcer disease, irritable bowel syndrome, and diabetes. (R. at 128.) Plaintiff's history also included two cesarian sections and a whiplash injury. (*Id.*)

11.     An EKG indicated a third degree aV block with a ventricular rate of 27, an anterior infarction, acute inferior myocardial infarction and possible ischemia. (R. at 135.) A chest x-ray disclosed congestive heart failure and pulmonary edema. (R. at 134.) Dr. Botts diagnosed acute myocardial infarction, possible anterior infarction, diabetic ketoacidosis, marked hyperkalemia, mild renal dysfunction, recurrent nausea with elevated liver enzymes, and menorragia. (R. at 129.) Dr. Botts informed Plaintiff's family of her "grave" diagnosis, inserted a temporary pacemaker and arranged for Plaintiff to be transferred to the care of Dr. Rizzo at St. Mary's Hospital in Lubbock, Texas. (*Id.*)

12.     Joseph Rizzo, M.D. diagnosed insulin-dependent diabetes mellitus and a probable acute inferior wall myocardial infarction complicated by diabetic ketoacidosis, complete heart block and hypotension. (R. at 104.) Dr. Rizzo started Plaintiff on intravenous nitroglycerin and planned to perform an angioplasty. (*Id.*) Plaintiff had a history of retinopathy. (*Id.*) Emergency cardiac catherization was revealed a totally occluded posterolateral branch of the right coronary artery and Plaintiff underwent a successful angioplasty. (R. at 214.) Plaintiff was also found to have a tight stenosis of the proximal left anterior descending artery and an additional angioplasty was planned. (*Id.*) Plaintiff slowly improved during a week of hospitalization, but her blood sugars were difficult to control. (R. at 101; 214.) Plaintiff had also fractured a rib when she collapsed. (R. at 101.)

Plaintiff was discharged from the hospital on July 29, 1996. (R. at 214.)

13.     On July 30, 1996, Plaintiff presented to the emergency room at Columbia Lea Regional Medical Center with severe weakness, nausea and vomiting. (R. at 108.) Plaintiff had no blood pressure and her pulse was 36 beats per minute. (R. at 109.) Dr. Botts noted that Plaintiff had undergone an angioplasty in Lubbock and also had seven eye surgeries due to her retinopathy. (R. at 108-109.) An EKG revealed a complete aV block with resultant brady dysrhythmia, possible acute myocardial infarction and no change from the July 23, 1996 tracing. (R. at 114.) Laboratory tests indicated that Plaintiff's diabetes was under very poor control, hyperkalemia, significant renal dysfunction, elevated liver enzymes and anemia. (R. at 121.)

14.     Dr. Botts diagnosed severe brady dysrhythmia secondary to complete aV block, arteriosclerotic heart disease, recent inferior myocardial infarction, high grade stenosis of the left anterior descending coronary artery, and possible diabetic ketoacidosis. (R. at 110). Plaintiff had severe hypoglycemia, with a blood sugar level of 700 and a creatinine level of 3.1. (R. at 101.) Her condition improved after Dr. Botts reinserted a temporary pacemaker and administered insulin. (R. at 110-122.) Plaintiff was airlifted back to Dr. Rizzo in Lubbock. (R. at 108; 110; 122.)

15.     Dr. Rizzo diagnosed complex brittle diabetes and a complete heart block. (R. at 102.) On July 31, 1996, Dr. Rizzo referred Plaintiff Gary D. Newsom, M.D., a kidney specialist, for a consultation. (R. at 145-146.) Dr. Newsom recommended that Plaintiff avoid converting enzyme inhibitors, non-steroidal anti-inflammatory medications and beta blockers, a loop diuretic to increase potassium, sodium exchange, 24 hour-urine testing for protein and creatinine clearance, a urine check for eosinophils, and a kidney sonogram. (R. at 147.) Dr. Newsom opined that Plaintiff was fine for a pacemaker after her potassium level was stabilized. (*Id*.) Plaintiff smoked, described herself as

having a type A personality, but denied alcohol and drug use. (R. at 148.)

16. An ultrasound of Plaintiff's kidneys showed a relatively small kidney on the left with mild caliectasis and small cysts. (R. at 214.) A dynamic renal scan showed normal vascular and nephrogram phase. (*Id*.) Toxicology screens, blood culture and rapid plasma reagin were all negative. (*Id*.) Urinalysis glucose spillage, trace amounts of occult blood, negative bacteria and a trace of protein. (*Id*.) An echocardiogram was essentially normal. (*Id*.) On August 1, 1996, Plaintiff's temporary pacemaker was discontinued and placement of a permanent pacemaker was deferred. (R. at 215.)

17. On August 3, 1996, Plaintiff was discharged from the hospital with instructions to follow a renal and diabetic diet and to follow-up with Dr. Rizzo and Dr. Botts. (R. at 215.) On discharge, Plaintiff was prescribed Axid, Persantine, Reglan, and insulin. (*Id*.)

18. On September 12, 1996, Dr. Rizzo performed left heart catherization, percutaneous transluminal coronary angioplasty of the left anterior descending coronary artery and stent implantation of the left anterior descending coronary artery. (R. at 203; 205; 206.) Plaintiff had severe disease of the proximal left anterior descending coronary artery, totally occluded postlateral branch of the right coronary artery, mild disease of the left circumflex coronary artery and hyperkinesis of the basal inferior wall with overall satisfactory left ventricular function. (R. at 206.) Plaintiff tolerated the procedure well without complications. (R. at 205.) The angioplasty and stent placement was successful. (R. at 203.) Plaintiff's recovery was uneventful and she had no further angina or shortness of breath. (*Id*.) Plaintiff was discharged to her home on September 13, 1996. (R. at 204.) Medications at the time of discharge were Cardizem, Ticlid, Humulin, Axid and Vitamin E. (*Id*.)

19.     Dr. H.A. Hansen was consulted for surgical stand-by for the September 12, 1996 surgery. (R. at 203.)  Dr. Hansen diagnosed Plaintiff with atherosclerotic occlusive disease of the coronary arteries with history of inferior wall myocardial infarction, history of complete heart block, insulin dependent diabetes mellitus, and history of tobacco abuse, hopefully resolved. (R. at 209.) Dr. J.R. Beceiro was consulted to assist in diabetic management. (R. at 203.)  Plaintiff was placed on sliding scale insulin as her glucose levels had been quite erratic. (*Id.*)  Dr. Beceiro diagnosed insulin-dependent diabetes mellitus, a history of diabetic retinopathy, coronary artery disease and history of tobacco use. (R. at 208.)

20.     On September 16, 1996, Dr. Rizzo saw Plaintiff for a follow-up appointment. (R. at 201.)  Plaintiff had no further chest pain or shortness of breath. (*Id.*) Dr. Rizzo continued Plaintiff on Ticlid, aspirin and dipyridamole, warned her about chest pain, and recommended that she follow-up with him in about three weeks. (*Id.*)

21.     On September 30, 1996, Dr. Rizzo saw Plaintiff for a follow-up appointment. (R. at 196.)  Plaintiff reported no chest pain, shortness of breath, palpitations or dizziness. (*Id.*)  Plaintiff's blood sugar was under fairly good control and she had started exercising. (*Id.*)  Dr. Rizzo noted that Plaintiff was doing "quite well," but that she had been a "little bit depressed and crying without provocation." (*Id.*)  Dr. Rizzo prescribed Paxil and suggested that Plaintiff follow-up with him in about three months. (*Id.*)

22.     On November 6, 1996, Dr. Rizzo saw Plaintiff for a follow-up appointment. (R. at 195.)  Plaintiff reported vague discomfort and pressure in her chest when she was upset. (*Id.*) Plaintiff's electro cardiographic response to graded submaximal exercise was normal, but her echocardiographic response to exercise was mildly abnormal. (R. at 194.)

23.      On January 6, 1997, Plaintiff requested twelve weeks of Family/Medical Leave from her job with the Hobbs Municipal Schools to allow for recuperation "away from stress and anxiety due to heart condition."  (R. at 190.)  Plaintiff wrote to Dr. Rizzo and asked him to fill out a physician's statement for her leave request.  (R. at 191.)  In her letter, Plaintiff stated that she was feeling somewhat better and had fewer problems with anxiety as she had been off work for the holidays, and that she believed that she should seek counseling for depression. (*Id*.)  On the Family/Medical Leave Physician's Statement, Dr. Rizzo wrote that Plaintiff's condition was not acute, that she needed one to three months for convalescence, that it was uncertain how long would be needed for complete recovery, and that Plaintiff was fit for limited duty but she could not do heavy work. (R. at 192.)

24.      On February 7, 1997, Dr. Rizzo noted that Plaintiff had "done very well" since placement of the stents.  (R. at 162.)  Plaintiff reported no chest pain, no shortness of breath, no palpitations and no dizziness. (*Id*.)  The chest discomfort that Plaintiff had suffered the previous November had ceased along with the stress after she left work.  (*Id*.)  Plaintiff had been exercising regularly and had trimmed down. (*Id*.)

25.      Dr. Rizzo noted that Plaintiff had severe disease of the LAD which was stented.  (R. at 154; 156.) On August 17, 1997, Plaintiff reported recurrent chest tightness associated with stress, but had a normal electro-cardiographic response to graded submaximal exercise, normal resting echocardiogram and normal echocardiographic response to exercise.  (R. at  156-159.)

26.      On November 24, 1997, Dr. Rizzo noted that Plaintiff was doing very well, with no chest pain, shortness of breath or dizziness, but occasionally had tightness with emotional upset. (R. at 154.)  Dr. Rizzo continued Plaintiff's medications and planned to follow up with her in six months.

(*Id.*) Plaintiff had a normal electro-cardiographic response to graded submaximal exercise and normal resting echocardiogram and normal echocardiographic response to exercise. (R. at 159.)

27. On March 12, 1998, Donald B. Stewart, M.D. completed a residual functional capacity assessment. (R. at 166-168.) Dr. Stewart opined that Plaintiff could lift up to twenty pounds occasionally, ten pounds frequently, could stand and walk about six hours during an eight hour workday, could sit about six hours during an eight hour workday, could push and pull up to her lift and carry weight limitations, and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 167-168.)

28. On May 22, 1998, Dr. Rizzo saw Plaintiff in follow up and noted that Plaintiff was having some chest pressure intermittently associated with some discomfort of the lower arm and scheduled Plaintiff for a stress echocardiogram. (R. at 353.) On May 27, 1998, Dr. Rizzo noted that the Plaintiff had a normal electro cardiographic response to graded submaximal exercise, a mildly abnormal resting echocardiogram and normal echocardiographic response to exercise. (R. at 178-181.)

29. On July 7, 1998, Dr. Rizzo opined on a form that Plaintiff could work three hours out of an eight hour day and could stand, sit, walk and drive for one to three hours during and eight hour day. (R. at 282.) Dr. Rizzo indicated that Plaintiff could also occasionally bend, squat, climb, reach, and crawl, and could frequently kneel and use her feet. (*Id.*) Additionally, Dr. Rizzo stated that Plaintiff was limited to lifting ten pounds and performing sedentary work and needed to avoid extreme heat and cold due to her cardiac condition. (*Id.*)

30. On July 15, 1998, Plaintiff's representative called the Social Security Administration and stated that Plaintiff was additionally impaired due to depression and her vision. (R. at 250.) The

agency employee noted that Plaintiff had gone to the Guidance Center once, but no examination was done because insurance would not cover it. (R. at 251.)

31.     On August 31, 1998, Cheryl Hollingsworth, M.D. performed a consultative psychiatric evaluation. (R. at 252-255.) Plaintiff's psychomotor status was normal and her speech was fluent and goal directed. (R. at 254.) She had no hallucinations, paranoia, formal thought disorders or delusional content. (*Id.*) Her affect of expression was appropriate, her mood was euthymic. (*Id.*) Plaintiff's long-term and short-term memory and her immediate recall were intact. (R. at 255.) She was oriented to time, place, person and situation. (*Id.*) Her judgment and insight were good and her intelligence was average. (*Id.*) Plaintiff had no suicidal or homicidal intent and no obsessive or compulsive behaviors. (*Id.*)

32.     Dr. Hollingsworth diagnosed adjustment disorder, with depressed mood in full remission and assessed Plaintiff's GAF score at 75.[1] (*Id.*) On September 2, 1998, Dr. Elizabeth Chang, M.D. prepared a Psychiatric Review Technique Form. (R. at 265-272.) Dr. Chang determined that Plaintiff never had restriction of activities of daily living, difficulties in maintaining social functioning, or episodes of deterioration of decompensation in work or work-like setting and concluded that Plaintiff's affective disorder was non-severe. (R. at 265; 272.)

33.     On September 8, 1998, Aida L. Recalde, M.D. completed a residual functional

---

[1]A GAF score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." *See* American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), (4th ed. 1994) at 30. The GAF Scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF of 75 means that is symptoms are present, they are transient and expectable reactions to psychosocial stressors and there is no more than a slight impairment in social, occupational or school functioning. *Id.*

capacity assessment. (R. at 274-281.) Dr. Recalde opined that Plaintiff could lift up to twenty pounds occasionally, ten pounds frequently, could stand and walk about six hours during an eight hour workday, could sit about six hours during an eight hour workday, could push and pull up to her lift and carry weight limitations, and had no limitations with respect to her ability to climb, balance, stoop, kneel, crouch, and crawl. (R. at 275-276.)

34.     On November 13, 1998, Dr. Kevin L. Allison, M.D., an ophthalmologist, examined Plaintiff and found that her visual acuity was 20/20 in the right eye and 20/80 in the left eye with her current refractions. (R. at 362.) Dr. Allison diagnosed diabetic retinopathy with ischemic maculopathy in her left eye and peripapillary in both eyes and vitreous strand in the left eye without significant traction. (R. at 363.) Dr. Allison recommended that Plaintiff be monitored conservatively and was not at that time in need of photo coagulation. (*Id.*)

35.     On December 7, 1998, Plaintiff underwent an initial client mental health evaluation at the Guidance Center of Lea County. (R. at 357.) Plaintiff was depressed and upset due to her chronic medical problems, was angry with her body for "letting her down" and was fearful that she would die before her children finished school. (*Id.*) Plaintiff had been prescribed Xanax and Prozac, but did not take them regularly because they made her "feel more tired." (*Id.*) Plaintiff was able to manage her own household, consisting of herself and her two teenage children. (R. at 359.) She got along well with others, but was experiencing low self esteem due to her physical limitations. (*Id.*)

36.     Plaintiff told the counselor that only about 40% of her heart was functioning as a result of her heart attacks and that she had lost the vision in her left eye due to her diabetes. (*Id.*) Plaintiff also stated that her right eye was "going rapidly." (R. at 360.) The counselor rated Plaintiff's affect as congruent, her mood as depressed, her intelligence as superior, her thought processing as intact.

12

(R. at 360.)  Plaintiff exhibited no paranoid or obsessive ideation, compulsive behavior or hallucinations. (*Id*.)  Her long term, intermediate term and short term memory were rated as good, her judgment was rated as intact, and her impulse control was rated as good. (*Id*.)  Plaintiff stated that she was depressed and angry.  (R. at 383.)

37.     On February 12, 1999, Dr. Rizzo noted that the Plaintiff had a normal electro cardiographic response to graded submaximal exercise, and a normal echocardiographic response to exercise.  (R. at  356.)  On August 30, 1999, Dr. Rizzo again saw Plaintiff in follow up.  (R. at 358.)  Plaintiff was doing well with no chest pain, shortness of breath, palpitations of dizziness.  (*Id*.)  Dr. Rizzo ordered an electrocardiogram and planned to follow up with Plaintiff in one year. (*Id*.)

38.     At the October 6, 1999 evidentiary hearing, Plaintiff appeared and was represented by John Ingram, a non-attorney.  (R. at 410.)  Plaintiff testified that she watched television, played cards with her children and played the piano.  (R. at 419.)  Plaintiff had eye problems and wore bifocals.  (R. at 419-420.)  Plaintiff graduated from high school and from junior college with an associate's degree in child psychology.  (R. at 420.)  Plaintiff did not have medical insurance. (R. at 421.)

39.     Plaintiff testified that she tried to go back to work as an instructional aide after her heart attacks, but that her medication made her sleepy and she was not dependable.  (R. at 422.)  Plaintiff had worked as a bookkeeper in 1989.  (R. at 423.)  Plaintiff was unable to work because she needed to sleep five or more hours during the day in addition to sleeping at night.  (*Id*.)  Plaintiff's medication made her tired, but her doctor told her that it was supposed to do so.  (R. at 423; 435.)  She was also unable to work due to problems with bladder control and her kidneys.  (R. at 424.)  Plaintiff also stated that she was unable to work because she could not work consistently and

dependably everyday. (R. at 425.)

40.     Plaintiff testified that her heart condition had improved after the surgeries, but that she still had angina. (R. at 424-425.) Plaintiff took insulin everyday for her diabetes and denied that she was non-compliant with her doctor's instructions. (R. at 425.)   Plaintiff saw her cardiologist about once per month. (*Id.*)   Plaintiff stated that she was depressed and angry due to her physical condition. (R. at 426.)  Her memory was not good and she had difficulty concentrating. (*Id.*)  Plaintiff was not seeking disability due to her mental problems. (R. at 434.)

41.     Plaintiff walked about a half a mile per day, and was uncomfortable sitting.  (R. at 427.) She tended to "black-out" if she had to stand. (*Id.*)  Her cardiologist told her not to lift more than ten pounds. (R. at 427-428.)  She slept about seven or eight hours per night and slept while her children were in school. (R. at 428.)  She would go shopping with her daughter. (*Id.*)  Plaintiff was able to fold clothes, cook some and occasionally do the dished.  (R. at 429.)  Her children did the rest for the house and yard work.  (R. at 428-429.)  Plaintiff drove about once per month, did needlework, played the piano and read.  (R. at 430.)  She had angina, which she described as "nothing severe." (R. at 431-432.)  Her feet also hurt due to diabetic abscesses and muscle cramps. (R. at 432.)

42.      Plaintiff testified that she had seven surgeries on her eyes and needed laser surgery but was unable to afford it.  (R. at 436.)  Plaintiff was able to pick up a gallon of milk or a ten pound sack of potatoes with her right hand. (R. at 436-438.)  Her left arm was weak and sometime painful due to the angina.  (*Id.*)  Plaintiff's blood sugar fluctuated a great deal.  (R. at 438.)  She had four diabetic black-outs during the previous summer that her children helped her to overcome. (R. at 439.) Plaintiff did not go to the hospital for the black-outs because she did not have any money.  (*Id.*)

43.     After the ALJ issued his decision, Plaintiff submitted additional evidence that was

included in the record and considered by the Appeals Council. (R. at 373-409.)  Plaintiff received mental health counseling from Claudette Tedrick at the Guidance Center of Lea County on approximately a monthly basis from December 1998 through 1999.  (R. at 390-409.)  Plaintiff was depressed and frustrated about not being able to work and not being able to obtain her disability and was particularly worried about her children. (R. at 391.)

44.     Plaintiff's progress was good and she was skilled at findings things to do to alter her frame of mind.  (*Id.*)  Plaintiff complained that she was not able to afford medical care even though her blood sugar was out of control.  (R. at 393.)  Ms. Tedrick obtained information for Plaintiff to apply for assistance from the Commission for the Blind.  (R. at 401.)  Plaintiff considered trying to go to work to obtain money for medical care and to support her children,  (R. at 399) and she worked at crafts to supplement her income.  (R. at 395.) Ms. Tedrick planned to assist Plaintiff in her efforts to obtain disability benefits.  (R. at 393.)

45.     On November 24, 1999,  Ms. Tedrick of the performed a Yearly Update Assessment. (R. at 374-378.)  Plaintiff was unable to afford medical care and she was worried that she might not live to see her children reach eighteen.  (R. at 374.)  Plaintiff felt depressed all the time and was chronically tired due to her physical condition. (*Id.*)  Ms. Tedrick planned to refer Plaintiff to the psychiatric clinic for evaluation for medication therapy. (*Id.*)

46.     Plaintiff reported that she had been prescribed Xanax and Prozac but could not always afford these medications.  (R. at 375.)  Plaintiff was experiencing suicidal ideation due to her physical condition and lack of medical resources. (*Id.*)  Plaintiff reported that she slept about twenty hours per day. (*Id.*)  Plaintiff told Ms. Tedrick that she had lost 45% of her kidney function and was blind in one eye.  (R. at 376.)  Ms. Tedrick noted that Plaintiff's appearance was appropriate, she was oriented

to time, place, person and situation, her intelligence was superior, her though processing and judgment were intact, and her long term, intermediate term and short term memory and impulse control were good. (R. at 376-377.) Plaintiff had no delusions, hallucinations, or paranoid ideation. (R. at 377.) Ms. Tedrick diagnosed Plaintiff with dysthymia and assessed her GAF score at 40. (*Id.*)

## Discussion

47.     Plaintiff contends that the ALJ erred his step three determination, erred in determining her residual functional capacity, erred in disregarding Dr. Rizzo's opinion, erred in determining that Plaintiff could return to her past relevant work, erred in failing to analyze whether her indigence constituted a justifiable excuse for failing to obtain medical treatment and erred in analyzing her mental impairment.

48.     Plaintiff contends that the ALJ should have found her disabled at step three, based on the listing for diabetes, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 9.08.  In order to qualify as disabled at step three, a claimant carries the burden the prove that she meets the criteria of the listing at issue. *See Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  Thus, in order be found disabled at step three under Listing 9.08, Plaintiff had the burden to show she satisfied all the criteria of this listing.  *Id.*

49.     Listing 9.08 provides:

9.08 Diabetes mellitus. With:

A. Neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C); or

B. Acidosis occurring at least on the average of once every 2 months documented by appropriate blood chemical tests (pH or $pCO_2$ or bicarbonate levels); or

C. Amputation at, or above, the tarsal region due to diabetic necrosis or peripheral arterial disease; or

D. Retinitis proliferans; evaluate the visual impairment under the criteria in 2.02, 2.03, or 2.04.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 9.08.

50.     Listings 2.02, 2.03 and 2.04 provide:

2.02 Impairment of central visual acuity. Remaining vision in the better eye after best correction is 20/200 or less.

2.03 Contraction of peripheral visual fields in the better eye.

A. To 10° or less from the point of fixation; or

B. So the widest diameter subtends an angle no greater than 20°; or

C. To 20 percent or less visual field efficiency.

2.04 Loss of visual efficiency. Visual efficiency of better eye after best correction 20 percent or less. (The percent of remaining visual efficiency=the product of the percent of remaining central visual efficiency and the percent of remaining visual field efficiency.)

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listings 2.02; 2.03; 2.04.

51.     The ALJ expressly evaluated Plaintiff's condition under the criteria of Listing 9.08 and concluded that she had failed to establish that her impairments satisfied the requirements of the listing. (R. at 15.) The record establishes that Plaintiff suffers from type I diabetes with insulin dependence. However, Plaintiff has failed to demonstrate that her condition satisfies any of the other criteria of Listing 9.08. Specifically, the record contains no medical evidence of neuropathy or amputation. The only documented episode of acidosis occurred in conjunction with Plaintiff's heart attacks in 1996 and there is no medical evidence of acidosis occurring at least on the average of once every two months.

52.     The record does establish that Plaintiff has diabetic neuropathy, but that condition

does not meet the listing because her vision corrects to 20/20 and 20/80. (R. 362-363.) In order to qualify as disabled at step three, the claimant must burden the prove that she meets the criteria of the listing at issue. *See Sullivan v. Zebley*, 493 U.S. at 530. Plaintiff's condition does not satisfy the criteria of Listing 9.08. Thus, her retinopathy does not meet the requirements of the listing. The ALJ applied correct legal standard in this regard and substantial evidence supports his conclusion at step three.

53.    The ALJ determined that Plaintiff retained the residual functional capacity for light work. (R. at 16.) Light work involves lifting no more than twenty pounds at a time, with frequent lifting and carrying of objects weighing up to ten pounds. See 20 C. F. R. §§404.1567(b); 416.967(b). Although the weight lifted may be very little, this category includes jobs which require a good deal of walking or standing, or sitting most of the time with some pushing and pulling of arm and leg controls. *See id.*    Substantial evidence supports the ALJ's determination

54.    The record establishes that Plaintiff's heart condition improved dramatically after her surgeries in the summer of 1996. In September 1996, Dr. Rizzo noted that Plaintiff had no further chest pain or shortness of breath, palpitations or dizziness and that she was doing "quite well." (R. at 196; 201.) In November 1996, Plaintiff reported vague discomfort and pressure in her chest when she was upset, and her electro-cardiographic response to graded submaximal exercise was normal, but her echocardiographic response to exercise was mildly abnormal. (R. at 194.) On the Family/Medical Leave Physician's Statement completed in January 1997, Dr. Rizzo wrote that Plaintiff's condition was not acute, that she needed one to three months for convalescence, that it was uncertain how long would be needed for complete recovery and that she was fit for limited duty in that she could not do heavy work. (R. at 192.)

55.     Similarly, in February 1997, Dr. Rizzo stated that Plaintiff had "done very well" since placement of the stents.  (R. at 162.)  Plaintiff had no chest pain, no shortness of breath, no palpitations and no dizziness. (*Id*.) In August 1997, Dr. Rizzo wrote that Plaintiff reported recurrent chest tightness associated with stress, but had a normal electro-cardiographic response to graded submaximal exercise, normal resting echocardiogram and normal echocardiographic response to exercise.  (R. at 156-159.)

56.     In November 1997, Dr. Rizzo opined that Plaintiff was doing very well, with no chest pain, shortness of breath or dizziness, but occasionally had tightness with emotional upset. (R. at 154.)  Plaintiff had a normal electro-cardiographic response to graded submaximal exercise and normal resting echocardiogram and normal echocardiographic response to exercise.  (R. at 159.) In May 1998, Dr. Rizzo recorded that Plaintiff was having some chest pressure intermittently associated with some discomfort of the lower arm, (R. at 353), but a May 27, 1998 electrocardiogram was normal.  (R. at  178-181.)

57.     In March 1998, Dr. Stewart opined that Plaintiff could lift up to twenty pounds occasionally and ten pounds frequently, that she could stand and walk about six hours during an eight hour workday, could sit about six hours during an eight hour workday, could push and pull, and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (R. at 167-168.)  In September 1998,  Dr. Recalde opined that Plaintiff could lift up to twenty pounds occasionally and ten pounds frequently, and that she could stand and walk about six hours during an eight hour workday, could sit about six hours during an eight hour workday, could push and pull, and had no limitations with respect to her ability to climb, balance, stoop, kneel, crouch, and crawl. (R. at 275-276.)  All of this evidence support the ALJ's finding that Plaintiff retained the residual functional capacity for light

work. The ALJ applied correct legal standards and his finding that Plaintiff retained the residual functional capacity for light work is supported by substantial evidence.

58.     Plaintiff asserts that the ALJ erred in discounting one of Dr. Rizzo's opinions.  The opinion in question was rendered on a form dated July 7, 1998, where Dr. Rizzo opined that Plaintiff could work three hours out of an eight hour day and could stand, sit, walk and drive for one to three hours during and eight hour day.  (R. at 282.)  Dr. Rizzo indicated that Plaintiff could also occasionally bend, squat, climb, reach, and crawl, and could frequently kneel and use her feet. (*Id.*) Additionally, Dr. Rizzo stated that Plaintiff was limited to lifting ten pounds and performing sedentary work and needed to avoid extreme heat and cold due to her cardiac condition.  (*Id.*)

59.     A treating physician may offer an opinion which reflects a judgment about the nature and the severity of a claimant's impairments. *See Castellano v. Secretary*, 26 F. 3d 1027, 1029 (10th Cir. 1994).  The ALJ must give controlling weight to this type of opinion if it is well supported by clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record.  *See id.*  However, a treating physician's opinion is not dispositive on the issue of disability because final responsibility for determining the ultimate issue of disability rests with the Commissioner. *Id.*

60.     In assessing proper weight to accord the opinion of a treating physician the ALJ must evaluate the degree to which the physician's opinion is supported by relevant evidence, the consistency between the opinion and the record as a whole, and other factors brought to the ALJ's attention which tend to support or contradict the opinion.  *See Goatcher v. Shalala*, 52 F. 3d 288, 290 (10th Cir. 1995).  The ALJ disregarded Dr. Rizzo's statements on the July 7, 1998 form because there was no objective basis for the limitations imposed.  (R. at 16.)  The ALJ additionally noted that

the July 1998 limitations were significantly greater than those in Dr. Rizzo's previous assessments and that her condition had not deteriorated in the intervening period based on the medical record. (*Id.*)  The ALJ applied correct legal standards in evaluating this opinion and substantial evidence supports his determination.

61.      Dr. Rizzo's July 1998 opinion was inconsistent with his January 1997 opinion that Plaintiff was fit for limited duty except for heavy work.  (R. at 192.)   Moreover, the July 1998 opinion was unsupported by the record, in which Plaintiff reported few symptoms, and her electrocardiograms were normal or only mildly abnormal.  (R. at 154, 158-159; 162; 195-196; 352; 355-356; 358.)  The ALJ properly disregarded Dr. Rizzo's inconsistent and unsupported opinion of July 1998.

62.      Plaintiff claims that the ALJ erred in determining that she could return to her past relevant work as an instructional aide.  Step four of the sequential analysis is comprised of three phases.  *See Winfrey v. Chater*, 92 F. 3d 1017, 1023 (10th Cir. 1996).  In the first phase, the ALJ must evaluate a claimant's physical and mental residual functional capacity.  *See id.* (*citing Henrie v. U. S. Dept of Health & Human Servs.*, 13 F. 3d 359, 361 (10th Cir. 1993)).  In the second phase, the ALJ must determine the physical and mental demands of the claimant's past relevant work.  *See id.*  In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.  *See id.*

63.      In this case, properly performed the step four analysis. First, the ALJ found that Plaintiff retained the residual functional capacity for at least light work. (R. at 16.)  In the second phase, the ALJ determined that Plaintiff's job as an instructional aide was light work.  (*Id.*)  Plaintiff

reported that her job as an instructional aide required four hours of walking in an eight hour day, one hour of standing in an eight hour day, three hours of sitting in an eight hour day, occasional bending, and frequent lifting of up to ten pounds. (R. at 74.) At the third phase, the ALJ concluded that Plaintiff's past work as an instructional aide did not entail any functional demands in excess of Plaintiff's residual functional capacity and thus she was able to perform her past job. (R. at 16.) Substantial evidence supports the ALJ's step four determination.

64. Plaintiff claims that the ALJ erred in failing to analyze whether her indigence constituted a justifiable excuse for failing to obtain medical treatment. The record contains no credible evidence that Plaintiff sought medical treatment for her conditions, but was refused for an inability to pay. *See Murphy v. Sullivan*, 953 F. 2d 383, 386-87 (8th Cir.1992) (holding failure to seek low-cost medical treatment and lack of evidence claimant had been denied medical care because of financial condition supported determination that claimant's financial hardship was not severe enough to justify failure to seek medical treatment). Indeed, Plaintiff was receiving on-going medical treatment as demonstrated by the record. Furthermore, the ALJ asked Plaintiff at the hearing whether adequate medical treatment was available and Plaintiff testified that treatment was available to her through clinics. (Tr. at 421.)

65. The ALJ's finding that Plaintiff was not fully credible is supported by substantial evidence. Plaintiff testified that was she needed additional eye surgery but was unable to pay for it. Plaintiff's testimony is inconsistent with the medical record, which indicate that additional surgery was not necessary. In November 1998, Dr. Allison recommended that Plaintiff be monitored conservatively and was not at that time in need of photo coagulation. (R. at 363.) Under these circumstances, the ALJ properly considered Plaintiff's lack of treatment in assessing the credibility

of her subjective complaints.

66.    Plaintiff asserts that the ALJ erred in analyzing her mental impairment.  Plaintiff submitted additional evidence of her mental condition to the Appeals Council after the ALJ denied her claim.(R. at 373-409.) Pursuant to 20 C.F.R. § 404.970(b), the Appeals Council is required to consider evidence submitted with a request for review if the additional evidence is new, material, and relates to the period under review.  *See O'Dell v. Shalala*, 44 F. 3d 855, 858 (10th Cir. 1994) Evidence is new within the meaning of § 404.970(b) "if it is not duplicative or cumulative," and it is material "if there is a reasonable possibility that [it] would have changed the outcome."  *Wilkins v. Secretary, Dep't of Health & Human Servs.*, 953 F. 2d 93, 96 (4th Cir.1991).  To be chronologically pertinent, "the proffered evidence [must] relate to the time period for which the benefits were denied."  *Hargis v. Sullivan*, 945 F. 2d 1482, 1493 (10th Cir.1991).

67.    The Appeals Council considered the evidence of Plaintiff's mental health treatment and found that it provided no basis for changing the ALJ's decision because the evidence did not provide a basis for changing the ALJ's decision.  (R. at 6.)  Thus, in determining whether substantial evidence supports the Commissioner's decision, a court must examine the record as a whole, including the additional materials submitted to the Appeals Council. *See O'Dell v. Shalala*, 44 F. 3d 855 at 858.

68.    The new evidence does not require a change in the ALJ's determination because the decision "remains supported by substantial evidence." *See O'Dell*, 44 F. 3d at 859.  The new evidence indicated that Plaintiff was suffering from dysthymia and was receiving mental health treatment.  The fact that a claimant suffers from a mental condition does not automatically establish that the claimant is disabled.  *Bernal v. Bowen*, 851 F. 2d 297, 301 (10th Cir. 1988).  Plaintiff told her therapist that she was looking for a job and doing crafts to supplement her income.   The new

evidence does not contradict the ALJ's conclusions. Based on a review of the administrative record, I conclude that substantial evidence supports the Commissioner's determination that claimant is not disabled within the meaning of the Social Security Act.

69.     Plaintiff contends that the Appeals Council ignored the fact that her therapist assessed Plaintiff's GAF score at 40 on November 24, 1999. Plaintiff acknowledges that a GAF alone does not establish and impairment interfering with a claimant's ability to work. (Pl.'s Reply Brief at 6.) The therapists's treatment records are inconsistent with the GAF score of 40. The records reflect that Plaintiff's progress was good and she was skilled at findings things to do to alter her frame of mind. (R. at 391.) Indeed, on the same day that GAF score of 40 was assessed, the therapist noted that Plaintiff's appearance was appropriate, she was oriented to time, place, person and situation, her intelligence was superior, her though processing and judgment were intact, and her long term, intermediate term and short term memory and impulse control were good. (R. at 376-377.) Plaintiff had no delusions, hallucinations, or paranoid ideation. (R. at 377.) Under these circumstances, the additional evidence, including the November 24, 1999 GAF score, submitted to the Appeals Council after the ALJ issued his decision did not provide a basis for changing the opinion of the ALJ.

70.     The Commissioner's decision that Plaintiff is not disabled because she can return to her past relevant work is supported by substantial evidence and is in accordance with the law.

## RECOMMENDED DISPOSITION

I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing, (Doc. 10), filed August 17, 2001, be **DENIED.**

Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations

that party may file with the Clerk of the District Court, 333 Lomas Blvd. NW, Albuquerque, NM 87102, written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

 

**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**